Let's call the next case. On 16-22-46, City of Chicago Heights v. Grand Inquisition. Counselor, you may proceed. Thank you. Justices, my name is George Spatero. I'm from the Delgado Law Group. In this case, we represented the City of Chicago Heights. This comes to the court from a decision in the 19B proceeding. This isn't a final trial. This was a hearing mid-case to determine a specific issue. The hearing really was to determine whether or not this complainant's need for a total knee replacement is related to the original injury and fall. Just briefly to recap the circumstance, Mr. Cush is a firefighter. On 4-17-2012, he was clearing from a false alarm when he stepped in a hole and twisted his knee. This isn't a knee that was not problematic previously. This was a knee that, in high school, he had a football injury to the very same knee. That football injury related to some serious damage to his meniscus. And he had surgery when he was in high school, and that surgery consisted of removal of the meniscus. Although he was, would you agree, asymptomatic according to all the evidence for 47 years? Yes, sir. I do agree with the fact that the petition testified that he didn't suffer any pain or any conditions from that period of time since his football injury and surgery. And he was on the job continuously. Does the city have any evidence that he was taking off work? We did not present any because we didn't have any evidence. Okay. All right. Your Honors, we agree that he sought immediate medical care. We agree that he went to the occupational clinic the very next day. And, in fact, the occupational clinic records reflect that he suffered a sprain of his knee. And when he continued to complain of pain, about seven days later, on the 25th of April, he had an MRI. And the MRI found degeneration in the knee. Everything about that MRI is about degeneration in the knee. That MRI did not find any new traumatic tears. In fact, what we know is as much of his meniscus was already gone from the high school surgery. What that MRI found was chrondomalacia. What it found was this degeneration in the joint and fraying. And it found some tearing of some of the ligament materials in the knee that resulted from the degeneration and not the twisting of the knee. Let's assume everything you say is true. As an experienced workers' compensation counsel. Yes, sir. She may not agree, you know, that there wasn't any new injury. Let's assume that this exacerbated and aggravated and accelerated a preexisting condition. Doesn't the petitioner still win? No, sir. Not in this situation. In light of the rule, when you give the answer, it doesn't have to be the sole cause, the primary cause. I agree with that. If it contributes to the condition of well-being, the petitioner recovers. So tell us why that rule doesn't apply here. Well, Judge, after the original surgery, wherein the doctor cleaned up the degenerative changes in the knee and shaved and clipped and did all kinds of repairs to matters that related to the degeneration, and after a short period of some therapy, Mr. Cush was found to be at MMI. And here's why I believe the answer to your question is that this is not an aggravation that caused the need for either of the surgeries. So if he's asymptomatic for 47 years, you don't dispute that he was injured, he stepped in a hole, right? Yeah. Okay. He stepped in a hole. All of a sudden, he's got all these problems. You're saying that what happened when he stepped in a hole had nothing to do with his problems after that? Well, Judge, I think it may have for a brief period of time. Yes. And I think that after his doctors treated him and cleared him of the condition related to the sprain, he was back to where he was before the fall. Well, Dr. Nickel was his treating physician, right? Yes, sir. Nickel opined that while Clayman's injury did not cause the condition, it definitely accelerated and aggravated an ongoing condition and prevented him from returning to work as a firefighter. So how can we say it wasn't a cause of the condition of well-being and wasn't related to the surgery? Well, Judge, I agree. On February the 15th of 2014, Dr. Nickel examined him. And Dr. Nickel examined him after that would have been a year and a half after his arthroscopic surgery to the knee. Dr. Nickel says that the April 2012 injury did not cause the DJD. And he says it only aggravated or accelerated it. But he didn't say that it aggravated it or accelerated it to the point to where he needed a knee replacement. And, in fact, doctors at Foresight came along eight months later and did an IME. And he says that his current condition of degenerative condition in the knee, the chondromalacia, I hope I'm saying that correctly, the degenerative joint disease, all of that, Dr. Foresight found, relates back to when the meniscus was removed. When you take the meniscus out of the knee, the knee doesn't operate the way a regular knee is supposed to.  Who's Dr. Jimenez? I don't know, sir. He's the one that gave an opinion that said specifically that there is evidence of some mild preexisting degenerative changes in the knee as a function of partial meniscus when the patient was 14. But it was functioning very well prior to the injury. And after the injury of April 17, 2012, he has been tremendously disabled and a rapid degeneration of his knee cartridges. Diagnosis, post-traumatic osteoarthritis and exacerbation of some preexisting degeneration. And the need for knee replacement now in 2014 is clearly related to and caused by the work-related event of April 17, 2012. Yes, it is. Yes, it is. And I believe I recall who he is now. He was the petitioner's independent examiner. The respondent's independent examiner felt different. But if you were to say that the two of them dispute each other, then what about the surgeon? The surgeon, Dr. Niggle, was inside the knee. The surgeon, Dr. Niggle, didn't find any traumatic tears. Dr. Niggle didn't find any evidence of a traumatic injury. What he found was all matters related to this longstanding, ongoing deterioration. We go around and around. Does he need to find a tear? Does he even need a new injury? Jimenez, I submit to you, is sufficient for the commission alone to hang their hat on. They don't need anything beyond that. In the testimony of the claimant, he's asymptomatic for 47 years. As you know, as a city attorney, a firefighter's job is very stressful. Okay? Is it a coincidence he's fine for 47 years, steps in a hole, and all of a sudden he can hardly move around? Jimenez, I agree that the courts are very sympathetic to police officers and firemen. Well, we're not. I agree with that. And I agree that they do very hard jobs. And I agree that they do things that many of us don't want to do. But what I don't agree with is that every time someone bumps a knee, who has a preexisting condition in that knee, causes the municipality to own it. No, I understand what you're saying. And, again, I think I'm not speaking for my entire panel. You know, you're right. We have to rule on the evidence. Nobody's saying because he's a firefighter he should be entitled to win. But you've got medical testimony in addition to his testimony that clearly supports it. You can't get around Jimenez's testimony. It's there. Whether you believe it or not, it's there. So you can't parse this as a case he's a firefighter, he automatically wins. Nichols said the same thing. Nichols says the painless injury occurred in April of 2012 and did not cause his arthritic disease, but it definitely accelerated and aggravated an ongoing condition. I agree with that, Judge. And, Judge Hoffman, what he said was it accelerated it and aggravated it. But what he didn't say is did it accelerate it and aggravate it to the point where now the city owns a total knee replacement. Jimenez said it did. Jimenez said Dr. Nichols acquired it. I'm sorry, sir. Nichols says that surgery will not cure the DJD. So why are we paying for it then? Why do we own this? Why do municipalities own these circumstances where individuals are going to be paid to pay for it all? Counselor, counselor, counselor. Save the municipality-owning business stuff. We're on the facts of this case. Yes, sir. Nichols says it aggravated the preexisting condition. Jimenez says it not only aggravated the preexisting condition, but it was the occasion that created the need for knee replacement surgery in 2024. Why can't the commission believe him? And don't tell me because we're mean to fire municipalities for policing and firefighting. What I would say responsibly as you're talking is this, that I think that if you're having a dispute among doctors, what's the doctor that you rely upon the most? The guy who cuts open the body, who looks inside the body, who sees what's in there, sees what's wrong, and addresses it. Not an opinion giver who's looking at something that says this may or that may. Doctor, people look in there. Do you find any new tears? Do you find any new injury in there? Well, you know, I have to concede your argument does have some intuitive appeal. However, as you probably also know, we hear every day, all day long, that this doctor's in a better position. It's up to the commission's well-settled to wait. The medical evidence, the wait of the evidence. We defer to their expertise in that area. We can't substitute our judgment for the commission. They can believe, you know, the treating doctor. They can believe the IME. They can believe whoever they want. We can't throw out. Whether or not you would agree with this or not, you're wanting us to apply a preponderance standard and not the manifest wait standard here. That's your argument. Well, Judge, I guess it can be seen that way. I agree with you. My argument really at the end of the day is that if I have a man who twists his knee and who's found to be at MMI after a simple orthoscopic surgery that discovers no new injury during the surgery, I can't for the life of me believe that I don't have knee replacement because there was no proof in that trial. What he did for those number of years that might have caused the degeneration, they didn't entertain any evidence whatsoever. Even the mechanism of injury. He says I stepped in a hole and twisted my knee. Did he say which way it twisted? He doesn't have to. There were witnesses there. There were firefighters there. Were there eyewitnesses to this injury? I don't believe so. Was there? Yeah. I'm sorry. You got help from the closing counsel. I'm not trying to be disingenuous. I just don't recall. No, it was testimony. He had to be escorted by the other firefighters and the police officer. It's pretty clear. Well, escorting someone after that, I don't know. Well, basically, just looking at this case here, we have manifest way to the evidence standard review. I agree with that. Yes, sir. So the question really and the burden you have is that there is not evidence here to support, right? Because if there's anything to support the decision of the commission, then as a reviewing court, we are to support the decision. I think if you use the word manifest, and you take Dr. Nichols and you put him on the same side as Dr. Forsythe, and then you put Dr. Jimenez over here, I think manifest way falls over here with Dr. Forsythe and Dr. Nichols. And you certainly entitled your opinion. Yes, sir. Counsel, how can you put Dr. Nichols on the other side? We have a statement that Justice Holman read that he definitely accelerated and aggravated the mental condition. When he says that, he's going on the pain complaints of Mr. Cush. After the arthrostatic surgery, Mr. Cush went through arthrostatic surgery. The only thing that didn't resolve was his pain. And he continued to say, I still have pain. I still have pain in my knee, over and over again. And they took that to the next step. While you still have pain, you have all this degeneration in your knee, but you need a knee replacement. And then all of a sudden, this fellow knows it. Yes. May I get to the second portion of it? Well, you have just a minute and a half. Give me two seconds to say the second portion. Sorry. The second portion of it is whether or not he's entitled to end TTD after November the 20th of 2014. And briefly just to say that when he was found in MMI and given restrictions, he did not come back to work. Because he couldn't. He wouldn't let him come back to work. Judge, there's other things that firefighters can do, like drive fire trucks. There's other things that firefighters can do. Wait a minute. Did you offer him a job within his restrictions? No. He didn't come in. He just retired. He flat out chose because he already had 29 years and 10 months of service. And his testimony at the hearing was, well, I didn't really want to retire until I was 31 years of service, or some number of years of service over this number of years. Did I miss something, or did the doctor impose restrictions on what his duties could be for the department? And the city decided you couldn't accommodate the restrictions. All right. I don't believe the city decided that, sir. All right. Do I have to take to the record again? He didn't come in. I think that he testified himself that he didn't come in after that. He just decided to retire. That was against his original thought that he wanted to wait until 31 years of service to retire, but he hadn't. So he just decided that he should just retire. My reading of the facts here differ from yours. Yes. My reading of the facts indicates that Nichol imposed restrictions on November the 20th, 2012, that the claimant informed you of those restrictions imported by Nichols, but refused to accommodate the restrictions. Is that an incorrect statement? Judge, I don't believe we put any witnesses on at the hearing, and I don't believe that it was proved at the hearing that we refused to accommodate. Did he say so? I did make the petition testify to that, yes. He said it, and you put on no witnesses to contradict it, so it isn't so? Well, Judge. What's that logic? I don't understand that. At the point that he says it, I'm caught dead footed. I don't know he's going to say, well, I called him and they said we don't have anything for you. That was not in my wheelhouse at all before he said it at the trial. And if you know, at that point, that's water over the bridge for me. I can't pick up a phone in the hearing and call someone down to jump on the witness stand to say he did or he didn't. I'm caught dead footed. Mr. Smataro, it doesn't really get to my point. My point is, did he or did he not testify that he informed your client of his restrictions and your client refused to accommodate? I believe he did say that, sir. Okay. And there is no contradicting evidence in the record? None available in the courtroom at the time he said it. Okay. You have time in reply. Thank you, sir. Counsel, you may respond. Good afternoon, Your Honors. I'm Leslie Rosen on behalf of Mr. Cush. This is an astonishing appeal. There's no merit to it whatsoever. The evidence, as you all understand, was uncontested. The only person who testified was Mr. Cush. If Mr. Sparato wanted other evidence, he could have prepared for the trial differently than he did. Just a clarification. Didn't the firefighter also actually give the name of somebody who communicated to him? Mr. Angel. Mr. Angel or A-N-G-E-L. He didn't say they wouldn't let me commit. He specified who told him he couldn't do it. Yes. Yes, he sent him an e-mail. And that could have been refuted prior. I mean, if there had been unearthed discovery, I don't know what else we should have done. This was uncontested. It was not only uncontested. He ran five to eight miles a day. He worked out five times a week. He played golf. He had 47 years, no injury to his leg. He was a high school kid. He had torn meniscus. This was not just a bumps-the-knee-here case. He fell into an 18-inch hole. He heard a pop, he testified. The other men had helped him get up. He couldn't get up. And everything he did after that was consistent with this injury. Yeah, he was old. He was older. He had a life. And he had previous injury. But this particular workplace injury was causally related to his current condition. There was no testimony that it wasn't, except for Dr. Forsythe, who testified for five to seven minutes and wrote that it wasn't the other eye injury, as you understand. Dr. Jimenez said it was. Dr. Nichols said it was. It definitely accelerated and aggravated an outgoing condition. There's clear causation. The counsel, wasn't he wearing his full equipment? 90 pounds or so. And when he was returned to work, yeah, Dr. Nichols said, yes, but that didn't mean he was back to normal. It meant the restrictions were no lifting over 20 pounds, no crawling, no carrying. That's ridiculous. He tried to go back to work. Nobody offered him a job to drive a fire truck. It's ridiculous. It doesn't even meet the preponderance standard. But it certainly doesn't meet that, but it certainly doesn't meet the manifest weight of the other men. The records don't, the testimony was, it's just very clear. Is there sufficient evidence in the record to support the commission's decision? Of course there is. There's three doctors who say there is, and that's it. And then on the other, he made two other arguments in his brief. A few of them, voluntary retirement, I don't think so. And then the other two arguments he doesn't even cite authority for, so those have to be waived. And with that, I think we all understand the facts, and I have nothing else to say. Unless you have any other questions. Thank you, Counsel. Thank you. Thank you, Counsel. Briefly, Your Honor. Counsel. The cases that I did cite, and mainly the Schwartz case, is a case that stands for the proposition that if you remove yourself from the workforce, you can't have TKD. You're absolutely correct. But Land O'Lakes says the opposite. If you're forced to retire and it's not voluntary, you can retire. Judge, if this man wasn't forced to retire, there were no retirement letters sent to him. There were no union proceedings that took place. There was nothing. If you're told you can't come back to the job, what are you supposed to do? Sue the city first before you can maintain that you were forced to retire? I don't think that would be an option, no, but I think that at least you could go in there and say, You're talking about grievance? Grievance? Can I drive a truck? Can I teach fire safety classes? Those are all fire jobs. Well, did you hear the name of the angel? Who's this angel? I have no idea. I've never even heard of him. He works at the fire department. I've never heard of him, sir, Your Honor. All right. Well, anyway, it's in the record. Thank you. Thank you, Counsel. Thank you, Counsel Bolson, for your arguments in this matter. It will be taken under advisement that this position shall stand in recess until 9 a.m. tomorrow morning. Thank you. Thank you.